Gregory R. Preston, Esq. (GP6138)
Preston & Wilkins, LLC
76 South Orange Avenue, Ste. 210
South Orange, New Jersey 07079-1923
212-809-5808
Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

---------------------------------------------------------------X

GERALD ADAMS AND JULIA JONES,               CIVIL CASE NO. 2:21-cv-17442

               Plaintiff(s),             **AMENDED COMPLAINT
AND JURY DEMAND**

          -against-

DMG PARK, LLC, DMG INVESTMENTS, LLC
DMG PROPERTY MANAGEMENT, LLC, AND
ONE PARK CONDOMINIUM ASSOCIATION,
INC., AND JOHN DOES 1-100,

             Defendant(s).

---------------------------------------------------------------X

Plaintiffs Gerald Adams and Julia Jones, by their attorneys Preston & Wilkins, complaining of the Defendant's avers and says:

**JURISDICTION AND VENUE**

1. Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. sections 1331, 1367, 42 U.S.C. section 3604 et seq., the New Jersey Law Against Discrimination and the Common Law.

2. The unlawful discriminatory practices alleged in this Complaint took place in Bergen County, New Jersey, which is within the District of New Jersey.

**THE PARTIES**

1. Plaintiffs Gerald Adams ("Adams") and Julia Jones ("Jones") are African American citizens of the United States.

2. Upon information and belief, Defendant DMG Park, LLC ("DMG Park") is a limited liability company with a principal place of business in New Jersey and is the sponsor/developer of One Park Condominium ("One Park").

1

3. Upon information and belief, Defendant DMG Investments, LLC is a limited liability company with a principal place of business located at 100 Wall Street, Suite No. 2203, New York, New York 10005 and is DMG Park's sole member. DMG Investments marketed itself as the project developer of One Park.

4. Upon information and belief, Defendant DMG Property Management ("DMG Management"), LLC is a limited liability company with a principal place of business located at 100 Wall Street, New York, New York 10005 and is the management company designated to operate and manage the One Park, located at 320 Adolphus Avenue, Cliffside Park, New Jersey 07010.

5. One Park is a luxury high-rise building built in April 2018.

6. Defendant DMG Management's duties related to One Park include but are not limited to the following:

   a. Hiring, paying, supervising, and discharging necessary personnel;
   b. Ascertaining the general condition of One Park;
   c. Maintaining a businesslike relationship with the unit owners;
   d. Maintaining One Park to standards acceptable to One Park's governing association;
   e. Maintaining a comprehensive system of office records, books, and accounts, which shall be subject to examination by their authorized Managers (not defined);
   f. Operating and maintaining the building according to the highest standard achievable consistent with the overall plan and interest of the Association. Manager shall see that all unit owners are informed with respect to such rules, regulations, and notices as may be promulgated by the Association from time to time; and
   g. Performing such other acts and deeds as are reasonable, necessary, and proper in the discharge of its duties.

7. Upon information and belief, Defendant One Park Condominium Association (the "Condo Association") is an entity that is duly organized and existing under and by virtue of the laws of the State of New Jersey, maintaining a place of business at 320 Adolphus Ave, Cliffside Park, New Jersey 07010.

## **FACTUAL ALLEGATIONS**

8. Plaintiffs Adams and Jones are owners of unit number 512 at One Park.

9. Prior to Plaintiffs purchasing their unit, DMG Park lied about which units were available for sale and would only show Plaintiffs certain units due to their race.

10. Upon information and belief, Defendants lied to other African Americans about what units were available at One Park.

11. Another African American couple wanted to rent a unit at One Park and requested to see the penthouse with a city view. They were told by Defendants, their agents, and/or employees,

that the only units that were available at One Park went up to the eighth floor, which was untrue.

12. The African American couple also asked to see other apartments on upper floors with city views.  Upon information and belief, they were told that it was against building policy to rent them units at One Park with city views.

13. Conversely, there were Caucasian and non-African American tenants who were shown and renting apartments on the upper floors at One Park Condo with city views.

14. The African American tenants were also told that Defendants would not pay for the installation of blinds in their unit, while One Park paid in full for the installation of blinds in the units of similarly situated Caucasian renters at One Park.

15. The discrimination against the Plaintiffs Adams and Jones continued after they closed on purchasing their unit and moved in.

16. Defendants and their agents and employees have engaged in a campaign of systematic harassment and discriminatory actions against Plaintiffs Adams and Jones based upon their race.

17. Defendants' harassment and discrimination against the Plaintiffs include but is not limited to denying Plaintiffs building services, failing to respond to their complaints, failing to provide Plaintiffs with requested information, making false allegations against the Plaintiffs, fining the Plaintiffs for purported violations of the One Park rules, and filing a counterclaim against the Plaintiffs only, in a lawsuit brought by tenants against the owners at One Park.

18. Similarly situated Caucasian owners at One Park have not been subject to the same treatment.

19. A former employee of One Park provided a sworn affidavit in which she stated that she "personally witnessed many situations of discrimination against people of color, particularly against Black and Brown unit owners."

20. The employee stated that "the way One Park treated its residents of color deeply troubled . . .[her] because the property managers were dismissive and were designed to punish them by taking things away from them for having the audacity to complain about issues in the complex."

21. The employee stated that she was specifically told by superiors that Plaintiff Adams and Jones were to receive no assistance with complaints or maintenance requests.

22. On April 13, 2019, the dryer in Plaintiffs' unit broke down, which Plaintiffs reported to DMG Management.

23. Kristen Gottschalk (Property Manager) would not provide the Plaintiffs with warranty information for the dryer. After numerous emails following up on the status, the dryer was finally replaced three months later on July 23, 2019.

24. From May 24-27, 2019, the water in Plaintiffs unit would not turn on. Plaintiffs notified the Superintendent Polo Morales ("Super. Morales") of the problem. The water was not turned back on in Plaintiffs' unit until May 28, 2019.

25. From May 31-June 2, 2019, the water was again turned off in Plaintiffs' unit without explanation.

26. From June 7-10, 2019, the water was again turned off in Plaintiffs' unit without explanation.

27. From June 14-17, 2019, the water was again turned off in Plaintiffs' unit without explanation.

28. From June 21-23, 2019, the water was again turned off in Plaintiffs' unit without explanation. Each time that the water was turned off in Plaintiffs' unit, Plaintiffs notified Super. Morales.

29. Upon information and belief, the only water at One Park that was turned off was to Plaintiffs' unit.

30. Upon information and belief, similarly situated Caucasian tenants did not have their water turned off on consecutive weekends.

31. On July 13, 2019, Super. Morales let himself into Plaintiffs' unit at 2:48 pm and he appeared to be inebriated. Super. Morales offered no explanation for why he made an unauthorized entry into Plaintiffs' apartment.

32. The Supers unauthorized entry was reported to DMG Management.

33. Plaintiffs are not aware that anything was done to address Super. Morales unauthorized entry into their unit.

34. Upon information and belief, Super. Morales did not make unauthorized entry into Caucasian tenants' apartments.

35. This was not the only unauthorized entry into Plaintiffs unit. On February 11, 2020, at approximately 8:48 a.m., Monseur, the handyman, used a building master key to open Plaintiff's unit door and walk-in.

36. Plaintiff asked Monseur about the unauthorized entry into Plaintiff's unit. Monseur stated that he needed to get into Plaintiff's unit to repair a leak.

37. Plaintiffs' unit had no leaks.

38. This incident was reported to DMG Management who refused to apologize or discipline Monseur for his unauthorized entry into the Plaintiffs' unit.

39. On October 11, 2019, Plaintiff had an interior designer and her employees working in their unit.

4

40. Plaintiff asked the superintendent to come to their unit so that he could answer a few questions regarding the unit construction.

41. Once the superintendent arrived, the interior designer began to ask the superintendent questions. The superintendent put his hand in her face motioning for her to stop talking.

42. The superintendent asked the designer who has a dark complexion if she was part of Plaintiffs' family. Once she answered no, he stated that he wouldn't talk with her.

43. The superintendent stared at the designer's workers and asked me if they were legal to work in the United States. They are all black as well.

44. This incident was reported to DMG Management. Upon information and belief, nothing was done about this incident.

45. Upon information and belief, the behavior of the superintendents toward Plaintiffs was not limited to Plaintiffs. Another African American resident indicated that in response to a request for assistance, Superintendent Besim Bekteshi yelled at the tenants to stop talking and he stated that he was not going to help them.

46. On or about October 11, 2019, the power in Plaintiffs' unit went off after Plaintiff plugged in the toaster.

47. Plaintiff was advised by the electrician that all the breakers in the apartment were defective and needed to be replaced.

48. DMG construction manager, Mike Ma, refused to answer emails regarding the electricity. Plaintiff emailed Kristen Gottschalk for a copy of the New Jersey Home Warranty and a copy of the electrical warranty. She failed to provide either document.

49. On or about October 15, 2019, a plumber from Meili Plumbing was working in Plaintiffs' unit. He referred to people of color in Harlem as monkeys and made several other racist comments.

50. Plaintiff reported this to DMG Management and Plaintiff asked that the plumber be banned from their unit.

51. The building ignored Plaintiffs' request and sent the same plumber to Plaintiff's unit again. Plaintiff refused to allow the plumber to work in their unit and asked for another plumber to be sent.

52. On January 13, 2020, Marc Brenner, the onsite realtor for DMG, made a harassing call to Ms. Jones cell phone from the One Park sales office. This was the culmination of numerous acts of harassment by Mr. Brenner, Taryn Byron, and Marina Brenner.

53. DMG Management was notified on multiple occasions of the ongoing harassment, but DMG Management refused to have these individuals removed from the building nor hold a mediation to resolve the issues.

54. On February 29, 2020, at approximately 7:16 p.m., Ms. Jones received a phone call from the concierge aggressively asking to speak with Mr. Adams.

55. The individual stated that he was from the front desk. The individual told Ms. Jones to put Mr. Adams on the phone now. Ms. Jones repeatedly asked who was on the phone and they repeatedly said, "the front desk." In frustration, Ms. Jones hung up the phone thinking it was a prank.

56. Afterward, Mr. Adams called the front desk asking if someone had called asking for his unit. The front desk concierge stated, "yes I did". The concierge stated that Mr. Adams needed to come down to the front desk right now. When asked why, the concierge stated, "so I can kick your ass."

57. After arriving at the front desk, Mr. Adams asked the concierge if he had made a call to Mr. Adams, and he said yes. Mr. Adams identified himself and the concierge said that he was not the Mr. Adams he was looking for.

58. The concierge stated that the handyman had told him that Mr. Adams was the guy on camera that had threatened him. The individual in question who had threatened the concierge was named Charles. He is 6'3 and 225 lbs. and Mr. Adams is 5'6 175 lbs. Mr. Adams and the concierge waited for the handyman to return from break.

59. The handyman, Monseur, acknowledged that he had misidentified Mr. Adams.

60. This was reported to building management and neither employee was disciplined nor apologized for the incident.

61. Since January 2020, Plaintiffs' have made 9 requests for repairs in their unit. These include flooring repairs, plumbing repairs, electrical repairs, HVAC repairs, all of which have been placed on hold.

62. Upon information and belief, non-African Americans who have made repair requests have had their repairs made and completed.

63. Plaintiff asked DMG Management for the name of the company that had done work in their apartment and caused damage to their floor. DMG Management would not provide the name of the company, nor the names of the individuals that performed the work.

64. On or about September 12, 2020, Concierge Basilio called and harassed Ms. Jones about a building cart she was using. He was harassing her since she had not returned the cart in less than 30 minutes.

65. Non-African American owners and residents routinely leave the carts on floors overnight and do not return them, and they are not harassed for failing to return the building cart within 30 minutes.

66. On or about December 2, 2020, Plaintiff Adams asked the concierge why they continue to refuse to allow Plaintiffs, interior designer, to use the rolling cart to bring in materials for their unit, even though every other resident is allowed to use the rolling cart. Plaintiff Adams also asked why they give the designer problems accessing the key when there are notes in the system allowing her a key to Plaintiffs unit even if they are not present.

67. Melissa Davis, the DMG Assistant Property Manager, indicated that she would address the issue, however, this behavior continued until the interior designer completed the project.

68. On or about January 6, 2021, Roland, the handyman, dropped off mail at Plaintiffs' unit door that was not addressed to Plaintiffs.

69. Ms. Davis continually insisted that Plaintiffs open mail that is not addressed to Plaintiffs and stated that the Fire Chief dropped it off at Plaintiffs' door. The mail is a note from the Cliffside Park Fire Inspector addressed to One Park.

70. The concierge staff does not open the front door for Plaintiffs, nor address them appropriately.

71. The concierge staff opens the front door for Non-African American residents and addresses them appropriately.

72. Kelly Geng, DMG Managements former property manager, instructed One Park's concierge staff not to speak to certain tenants including Ms. Jones whom he described as "rude, fresh, and a mean tenant."

73. From approximately November 2019 through February 2021, Concierge Nancy Delatorre would repeatedly send black visitors to Plaintiffs unit assuming that they were at One Park to visit Plaintiffs.

74. On many occasions, Plaintiff Adams advised Ms. Delatorre that just because a guest is black that does not mean that they are a visitor of Plaintiffs.

75. On or about August 14, 2021, DMG Management employee Kelly Geng falsely alleged that she witnessed Ms. Jones harassing the front desk concierge; that Ms. Jones and Mr. Adams had threatened a cameraman that was working for Ms. Geng; and that Ms. Geng had called the police on Mr. Adams because she felt unsafe in his presence.

76. All of Ms. Geng's allegations were false.

77. One Park has suites where tenants and owners guests can stay while visiting at One Park. Plaintiffs Adams and Jones and another African American resident are required to pay for the suites, while similarly situated tenants and owners, who are not African American, are not required to pay for the use of the suites.

7

## Issues With Parking and The Parking Garage

78. One Park has an automated parking garage on the premises which One Park marketed as state of the art.

79. The automated parking system is supposed to permit owners to drive their cars onto an entry bay, after which the automated system would pick up the car and transport it to the owners' designated spots.

80. On or about May 1, 2020, the Concierge told Plaintiff Jones that she is not on the list to receive a parking decal. She advised Ms. Jones that she needs to email the Leasing staff of DMG Investments to resolve the issue of the parking decal, although the Concierge claimed that she had no email for DMG Investments.

81. On or about June 3, 2020, after receiving several emails to pick up a parking decal for the guest parking lot, Plaintiff Adams walked to the front desk to ask for a parking decal from Jeannette, one of the concierges.

82. Jeannette pretended not to have the decals even though Mr. Adams could see them on a clipboard in front of her. Jeanette walked to the back, pretended to be looking around for the decals.

83. Plaintiff picked up the clipboard and told Jeanette that these are the decals the email was referring to and that he was taking two for his vehicles.

84. The superintendent stated that Plaintiff Adams couldn't have the decals because he was told not to give any to Plaintiff. Non-African American residents had no problems obtaining parking decals.

85. DMG Management hired a company Unitronics to operate the garage.

86. Plaintiffs' vehicles have been damaged by the operation of the automated garage as follows:

   a. On or around Sunday, July 26, 2020, Ms. Jones and Mr. Adams' Porsche Panamera 4 was damaged during the automatic parking retrieval process.
   b. The car suffered over an estimated $2500 in damage.
   c. Neither DMG Investments nor Unitronics would provide insurance information for this accident.
   d. On or about August 31, 2020, Plaintiffs' BMW X6 was damaged by a technician who was manually operating the garage to move Plaintiffs' car.
   e. Plaintiffs had not asked for their car to be retrieved and still do not know why the car was being manually moved.
   f. Plaintiffs' car suffered approximately 5K in damage.
   g. Unitronics and DMG Management refused to pay for the damages, nor provide insurance information to cover the damage.

8

87. Upon information and belief, DMG Management paid for Eric Chang's vehicle after the garage damaged his car.

88. Eric Chang is a similarly situated resident at One Park who is not African American.

89. On or about December 15, 2020, Plaintiff witnessed an unnamed security guard taking video of Plaintiffs' license plate using his personal phone.

90. Christian O Lone of DMG Management, stated that he did indeed authorize the guard to take down Plaintiffs' information on a personal phone, but they performed a daily audit and wiped his phone of our personal information daily.

91. After the damage to their vehicles, Plaintiff Adams and Jones began parking their vehicles at the outdoor surface areas at One Park, like many other tenants and owners at One Park.

92. Upon information and belief, Plaintiff Jones and Adams vehicles were the only vehicles that received a note on them from DMG Management advising that they could not park at the outside surface areas.

93. On or about September 1, 2021, DMG Management threatened Adams and Jones with daily fines of $100 for parking in the surface parking areas.

94. Plaintiff Jones and Adams were then told that they should not communicate with DMG Management directly but through DMG's attorneys. Additionally, they were advised that prior to visiting the management office, Plaintiffs had to make their request through their attorneys with a 48-hour notice.

95. Plaintiffs are not aware of any other tenants or owners that are required to communicate with DMG Management through attorneys, nor required to provide 48-hour notice to visit the DMG Management office.

96. Upon information and belief, all the individuals that engaged in discriminatory behavior against Plaintiff based upon their race, including Kristen Gottschalk, Super Morales, Monseur the handyman, Besim Bekteshi, Mike Ma, Marc Brenner, Taryn Byron and Marina Brenner, were agents, employees or otherwise acting on behalf of Defendant DMG Park LLC, DMG Investments LLC, and DMG Property Management.

**The Condominium Election**

97. In March 2021, the Condo Association held an election for the condominium board during the association's annual meeting.

98. Ms. Jones was a candidate for election to the board.

99. Ms. Jones was subject to discriminatory treatment as it relates to the condominium board election as well.

9

100.    Specifically,

a.  All candidates in elections are allowed to provide a candidate information sheet that can be submitted to association members who are eligible to vote. Upon information and belief, Ms. Jones was the only candidate that was not afforded the opportunity to provide a candidate information sheet that wished to do so;

b.  All candidates are entitled to a complete list of eligible voters in the association. Ms. Jones made several requests for the list of eligible voters, however, she was not provided with this information prior to the election;

c.  Ms. Jones was prohibited from independently sending information to association voters; and

d.  Ms. Jones did not receive a ballot to vote in the election even though she was an eligible voter.

**The Pending Action Against Defendants in State Court**

101.    Due to Defendants mismanagement of One Park, fourteen residents, including Plaintiffs Adams and Jones sued Defendants and others in an action in the Superior Court of New Jersey, Law Division, Bergen County, docket no.: BER-L-6608-20.

102.    Notwithstanding that fourteen residents sued Defendants, the only two residents that Defendants filed a counterclaim against were Plaintiff Adams and Jones, which serves as another example of their discrimination and retaliation against Plaintiffs Adams and Jones.

## FIRST COUNT
## VIOLATION OF FAIR HOUSING ACT – HOUSING DISCRIMINATION

103.    Plaintiffs repeat and realleges the averments of paragraphs 1 through 101 as if fully set forth herein.

104.    Plaintiffs have established a prima facie case of housing discrimination.

105.    The effect of the Defendants' discriminatory practices complained of has been to deprive Plaintiffs of housing free of discrimination in the terms, conditions, privileges, and services that they are entitled to as owners of a unit at One Park.

106.    The unlawful housing discriminatory practice was intentional, done with malice, and with reckless indifference to the federally protected rights of Plaintiffs based upon their race in violation of the Fair Housing Act.

107.    By reason of the foregoing, Plaintiffs have suffered and will continue to suffer irreparable harm and injury.

## SECOND COUNT
## VIOLATION OF THE NEW JERSEY LAW AGAINST DISCRIMINATION – HOUSING DISCRIMINATION

108.    Plaintiffs repeat and realleges the averments of paragraphs 1 through 106 as if fully set forth herein.

109.    Plaintiffs have established a prima facie case of housing discrimination.

110.    The effect of the Defendants discriminatory practices complained of has been to deprive Plaintiffs of housing free of discrimination in the terms, conditions, privileges, and services that they are entitled to as owners of a unit at One Park.

111.    The unlawful housing discriminatory practice were intentional, done with malice and with reckless indifference to the protected rights of Plaintiffs based upon their race in violation of the New Jersey Law Against Discrimination.

112.    By reason of the foregoing, Plaintiffs have suffered and will continue to suffer irreparable harm and injury.

## THIRD COUNT
## RETALIATION

113.    Plaintiffs repeat and realleges the averments of paragraphs 1 through 111 as if fully set forth herein.

114.    Plaintiffs complained to agents and/or employees of DMG Park LLC, DMG Investments LLC, DMG Property Management and One Park Condominium Association that they were being discriminated against because they were African American in violation of civil rights laws.

115.    Plaintiffs have engaged in protected activity when they complained about discrimination in housing.

116.    As a result of their complaints of discrimination, Defendants have retaliated against the Plaintiffs by discriminating against Plaintiffs in the terms, conditions, and privileges associated with the purchase of a unit at One Park and denied the Plaintiffs services and facilities they are entitled to as owners of a unit at One Park.

117.    The unlawful housing discriminatory practice was intentional, done with malice and with reckless indifference to the protected rights of Plaintiffs in violation of the Fair Housing Act and the New Jersey Law Against Discrimination.

118.    By reason of the foregoing, Plaintiffs have suffered and will continue to suffer irreparable harm and injury.

11

## FOURTH COUNT
## BREACH OF CONTRACT

119.    Plaintiffs repeat and realleges the averments of paragraphs 1 through 116 as if fully set forth herein.

120.    Defendants offered the automated parking garage to the Plaintiffs.

121.    Plaintiffs accepted the Defendants' offer by parking their vehicles in the automated parking garage.

122.    The Defendants agreed to safeguard and return Plaintiffs vehicles undamaged from the parking garage.

123.    Since Plaintiffs vehicles were returned damaged, Defendants breached the agreement to the Plaintiffs.

124.    As a result of the breach of the agreement, Plaintiffs have suffered damages.

## FIFTH COUNT
## NEGLIGENCE

125.    Plaintiffs repeat and realleges the averments of paragraphs 1 through 122 as if fully set forth herein.

126.    The Defendants knew or should have known that the automated parking garage was defective.

127.    As a result of the Defendants' negligence in the ownership, operation, and maintenance of the automated parking garage Plaintiffs have suffered damages.

**WHEREFORE**, the Plaintiffs pray that this Court enter judgment on behalf of Plaintiffs against Defendants:

    a.    Declaring that the Defendants have violated the FAIR HOUSING ACT, NJLAD, and the Common Law;

    b.    For compensatory and consequential damages;

    c.    For punitive damages;

    d.    For Attorney's fees; and

    e.    For such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues triable by a jury.


Dated:  August 2, 2022                                Yours etc.,
            South Orange, New Jersey           PRESTON & WILKINS, LLC

                                                                *Gregory R. Preston*

                                                                 By: Gregory R. Preston, Esq. (GP6138)
                                                                 76 South Orange Avenue, Ste. 210
                                                                 South Orange, New Jersey 07079
                                                                 Tel: 212-809-5808
                                                                 Fax: 212-898-9034
                                                                 Attorneys for Plaintiffs