Gregory R. Preston, Esq. (GP6138)
Preston & Wilkins, LLC
76 South Orange Avenue, Ste. 210
South Orange, New Jersey 07079-1923
212-809-5808
Attorneys for Plaintiffs

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

-----------------------------------------------------------------X

GERALD ADAMS AND JULIA JONES,   CIVIL CASE NO. 2:21-cv-17442

       Plaintiffs,     **SECOND AMENDED**
                **COMPLAINT AND**
   -against-       **JURY DEMAND**

DMG PARK, LLC, DMG INVESTMENTS, LLC,
DMG PROPERTY MANAGEMENT, LLC,
ONE PARK CONDOMINIUM ASSOCIATION,
INC., MAVERICK CONCIERGE, AND JOHN
DOES 1-100,

       Defendants.

-----------------------------------------------------------------X

   Plaintiffs Gerald Adams and Julia Jones, by their attorneys Preston & Wilkins, complaining of the Defendant's avers and says:

### JURISDICTION AND VENUE

1. Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. sections 1331, 1367, 42 U.S.C. section 3604 et seq., the New Jersey Law Against Discrimination and the Common Law.

2. The unlawful discriminatory practices alleged in this Complaint took place in Bergen County, New Jersey, which is within the District of New Jersey.

### THE PARTIES

1. Plaintiffs Gerald Adams ("Adams") and Julia Jones ("Jones") are African-American citizens of the United States.

2. Upon information and belief, Defendant DMG Park, LLC ("DMG Park") is a limited liability company with a principal place of business in New Jersey and is the sponsor/developer of One Park Condominium Association, Inc. ("One Park"). DMG Park is owned and operated by DMG Investments, LLC ("DMG Investments").

1

3. Upon information and belief, Defendant DMG Investments is a limited liability company with a principal place of business located at 100 Wall Street, Suite No. 2203, New York, New York 10005, and is DMG Park's sole member. DMG Investments marketed itself as the project developer of One Park.

4. Upon information and belief, Defendant DMG Property Management, LLC ("DMG Management") is a limited liability company with a principal place of business located at 100 Wall Street, New York, New York 10005. DMG Property Management is owned and operated by DMG Investments.

5. DMG Investments is the management company designated to operate and manage One Park located at 320 Adolphus Avenue, Cliffside Park, New Jersey 07010.

6. One Park is a luxury high-rise building built in April 2018.

7. Upon information and belief, DMG Park is responsible for the rental and sales of units at One Park.

8. According to the Master Deed provided to Plaintiff, Defendant DMG Property Management's duties related to One Park include but are not limited to the following:

   a. Hiring, paying, supervising, and discharging necessary personnel;
   b. Ascertaining the general condition of One Park;
   c. Maintaining a businesslike relationship with the unit owners;
   d. Maintaining One Park to standards acceptable to One Park's governing association;
   e. Maintaining a comprehensive system of office records, books, and accounts, which shall be subject to examination by their authorized Managers (not defined);
   f. Operating and maintaining the building according to the highest standard achievable consistent with the overall plan and interest of the Association. The manager shall see that all unit owners are informed with respect to such rules, regulations, and notices as may be promulgated by the Association from time to time; and
   g. Performing such other acts and deeds as are reasonable, necessary, and proper in the discharge of its duties.

9. Notwithstanding, the Master Deed, based upon the information in One Park's Computer System, DMG Investments performs all of the functions of managing at One Park.

10. Upon information and belief, Maverick Concierge is a corporation organized and existing under the laws of the state of New Jersey, with its principal place of business at 1 Town Centre Drive, Cliffside Park, New Jersey 07010.

11. Upon information and belief Maverick Concierge was employed by DMG Investments to provide concierge, doorman personnel, and porter/cleaning services at One Park.

2

## **FACTUAL ALLEGATIONS**

12. Plaintiffs Adams and Jones are owners of unit number 512 at One Park.

13. Prior to Plaintiff's purchasing their unit, DMG Park lied about which units were available for sale and would only show Plaintiffs certain units, due to their race.

14. Upon information and belief, Defendants lied to other African-Americans about what units were available at One Park.

15. Another African-American couple wanted to rent a unit at One Park and requested to see the penthouse with a city view. They were told by Defendants DMG Park, their agents, and/or employees that the only units that were available at One Park went up to the eighth floor, which was untrue.

16. The African-American couple also asked to see other apartments on the upper floors with city views. Upon information and belief, the couple was told that it was against building policy to rent them units at One Park with city views.

17. Conversely, there were Caucasian and non-African American tenants who were shown and rented apartments on the upper floors at One Park Condo with city views.

18. The African American tenants were also told that Defendant DMG Park would not pay for the installation of blinds in their unit, while One Park paid in full for the installation of blinds in the units of similarly situated Caucasian renters at One Park.

19. In Winter of 2023, other African-American tenants inquired about purchasing a unit at One Park. Agents of DMG Park refused to show apartments on upper floors with city views.

20. The discrimination against the Plaintiffs Adams and Jones continued after they closed on purchasing their unit and moved in.

21. Defendants, their agents, and employees have engaged in a systematic harassment and discriminatory campaign against Plaintiffs Adams and Jones based on their race.

22. Defendants' harassment and discrimination against the Plaintiffs includes but is not limited to denying Plaintiffs' building services, failing to respond to their complaints, failing to provide Plaintiffs' with requested information, making false allegations against the Plaintiffs, fining the Plaintiffs' for purported violations of the One Park rules, and filing a counterclaim against the Plaintiffs, only, in a lawsuit brought by the tenants and owners at One Park.

23. Similarly situated Caucasian owners at One Park have not been subject to the same treatment.

24. A former employee of DMG Investments provided a sworn affidavit which stated they "personally witnessed many situations of discrimination against people of color, particularly against Black and Brown unit owners."

25. The DMG Investments employee stated that "the way One Park treated its residents of color deeply troubled . . .[them] because the property managers were dismissive and was designed to punish them by taking things away from them for having the audacity to complain about issues in the complex."

26. An employee stated that she was specifically told by superiors that Plaintiff Gerald Adams and Julia Jones were to receive no assistance with complaints or maintenance requests. The DMG Investments employee also stated that she believed that this was based on their race.

27. In an email to DMG Investments and DMG Property Management another DMG Investments employee also stated that they were told not to assist Mr. Adams and Mrs Jones with maintenance requests upon being hired.

28. Due to their race, DMG Investments and DMG Property Management regularly instructed new hires and existing staff to refuse service to Gerald Adams and Julia Jones

29. Another African-American couple was also told by DMG Investments employees that they would not receive assistance with their maintenance requests

30. On April 13, 2019, the dryer in Plaintiffs' unit broke down, which Plaintiffs reported to Kristen Gottschalk, who was an employee of DMG Investments.

31. Kristen Gottschalk (Property Manager) would not provide the Plaintiffs with warranty information for the dryer. Plaintiffs complained to Ms. Gottschalk that they were being treated differently due to their race as their non-African American neighbors were provided with warranties for their products and others had their non-functioning appliances replaced immediately. After numerous emails following up on the status, the dryer was finally replaced three months later on July 23, 2019.

32. From May 24-27, 2019, the water in Plaintiffs' unit would not turn on. Plaintiffs notified the Superintendent Polo Morales ("Super. Morales") who was an employee of DMG Investments of the problem. The water was not turned back on in Plaintiff's unit until May 28, 2019.

33. From May 31-June 2, 2019, the water was again turned off in Plaintiffs' unit without explanation.

34. From June 7-10, 2019, the water was again turned off in Plaintiffs' unit without explanation.

35. From June 14-17, 2019, the water was again turned off in Plaintiffs' unit without explanation.

36. From June 21-23, 2019, the water was again turned off in Plaintiffs' unit without explanation.  Each time the water was turned off in Plaintiffs' unit, Plaintiffs notified Super. Morales.

37. Upon information and belief, the only water at One Park that was turned off was to Plaintiffs' unit.

38. Upon information and belief, similarly, situated Caucasian tenants did not have their water turned off on consecutive weekends.  Plaintiffs complained to DMG Investments employees that they were being retaliated against due to making complaints about discriminatory treatment.

39. On July 13, 2019, Super. Morales let himself into Plaintiffs' unit at 2:48 pm and he appeared to be inebriated. Super Morales offered no explanation as to why he made an unauthorized entry into Plaintiffs' apartment.

40. The Super's unauthorized entry was reported to DMG Investment's Management.

41. Plaintiffs are not aware that anything was done to address Super. Morales unauthorized entry into their unit by his employer DMG Investments.

42. Upon information and belief, Super Morales did not make unauthorized entry into Caucasian tenants' apartments.

43. This was not the only unauthorized entry into the Plaintiffs' unit.  On February 11, 2020, at approximately 8:48 a.m., *Monseur*, the handyman, and DMG Investments employee used a building master key to open Plaintiff's unit door and walk in.

44. Plaintiff asked Monseur about the unauthorized entry into Plaintiff's unit.  Monseur stated that he needed to get into Plaintiff's unit to repair a leak.

45. Plaintiffs' unit had no leaks. Police were called and Monseur was given a criminal trespass warning.

46. This incident was reported to Evan Pimental who was employed by DMG Investments as a property manager for One Park who refused to apologize or discipline Monseur for his unauthorized entry into Plaintiffs' unit.

47. October 11, 2019, Plaintiff had an interior designer, and her employees working in their unit.

48. Plaintiff asked the superintendent Besim, who was an employee of DMG Investments, to come to their unit so that he could answer a few questions regarding the unit construction.

49. Once the superintendent arrived, the interior designer began to ask the superintendent questions. The superintendent put his hand in her face motioning for her to stop talking.

50. The superintendent asked the designer who has a dark complexion if she was part of Plaintiffs' family.  Once she answered no, he stated that he wouldn't talk with her.

51. The superintendent stared at the designer's workers and asked Ms. Jones if they were legal to work in the United States.  They are all black.

52. This incident was reported to Kristen Gottschalk of DMG Investments.  Upon information and belief, nothing was done about this incident.

53. Upon information and belief, the behavior of the superintendents toward Plaintiffs was not limited to Plaintiffs.  Another African American resident indicated that in response to a request for assistance, Superintendent Besim yelled at the tenants to stop talking and he stated that he was not going to help them.

54. On or about October 11, 2019, the power in Plaintiffs' unit went off after Plaintiff plugged in the toaster.

55. Plaintiff was advised by the electrician that all the breakers in the apartment were defective and needed to be replaced.

56. DMG Park construction manager, Mike Ma, refused to answer emails regarding the electricity.  Plaintiff emailed Kristen Gottschalk for a copy of the New Jersey Home Warranty and a copy of the electrical warranty.  She failed to provide either document.

57. On or about October 15, 2019, a plumber from Meili Plumbing was working in Plaintiffs' unit.  He referred to people of color in Harlem as monkeys and made several other racist comments.

58. Plaintiff reported this to the property manager who was an employee of DMG Investments and Plaintiff asked that the plumber be banned from their unit.

59. The building ignored Plaintiff's request and sent the same plumber to Plaintiff's unit again.  Plaintiffs refused to allow the plumber to work in their unit and asked for another plumber to be sent.

60. On January 13, 2020, Marc Brenner, the onsite realtor for DMG Park made a harassing call to Ms. Jones' cell phone from the One Park sales office.  This was the culmination of numerous acts of harassment by Mr. Brenner, Taryn Byron, and Marina Brenner.

61. DMG Park and DMG Investments were notified on multiple occasions of the ongoing harassment, but both refused to have these individuals removed from the building nor hold a mediation to resolve the issues.

62. On February 29, 2020, at approximately 7:16 p.m., Ms. Jones received a phone call from the concierge, who was an employee of DMG Investments, aggressively asking to speak with Mr. Adams.

63. The individual stated that he was from the front desk.  The individual told Ms. Jones to put Mr. Adams on the phone now.  Ms. Jones repeatedly asked who was on the phone and they repeatedly said, "the front desk."  In frustration, Ms. Jones hung up the phone thinking it was a prank.

64. Afterwards, Mr. Adams called the front desk asking if someone had called asking for his unit.  The front desk concierge stated, "yes I did".  The concierge stated that Mr. Adams needed to come down to the front desk right now.  When asked why, the concierge stated, "so I can kick your ass."

65. After arriving at the front desk, Mr. Adams asked the concierge if he had made a call to Mr. Adams, and he said yes.  Mr. Adams identified himself and the concierge said that he was not the Mr. Adams he was looking for.

66. He stated that the handyman had told him that Mr. Adams was the guy on camera who had threatened him.  The individual in question who had threatened the concierge was named Charles.  He is 6'3 and 225 lbs. and Mr. Adams is 5'6 and 175 lbs.  Mr. Adams and the concierge waited for the handyman to return from break.

67. The handyman, Monsuer, acknowledged that he had misidentified Mr. Adams.

68. This was reported to DMG Investments and neither employee was disciplined nor apologized for the incident.

69. Since January 2020, Plaintiffs' have made 26 requests for repairs in their unit.  These include flooring repairs, plumbing repairs, electrical repairs, HVAC repairs, all of which have been placed on hold by employees of DMG Investments.

70. Upon information and belief, non-African Americans who have made repair requests have had their repairs made and completed by employees/agents of DMG Investments.

71. Plaintiff asked DMG Management for the name of the company that had done work in their apartment and caused damage to their floor.  DMG Management would not provide the name of the company, nor the names of the individuals that performed the work.

72. On or about September 12, 2020, Concierge Basilio "Alex", who is an employee of DMG Investments, called and harassed Ms. Jones about a building cart she was using.  He was harassing her since she had not returned the cart in less than 30 minutes.

7

73. Non-African American owners and residents routinely leave the carts on floors overnight and do not return them without being harassed for failing to return the building cart within 30 minutes.

74. On or about December 2, 2020, Plaintiff Adams asked the concierge why they continued to refuse to allow Plaintiffs' interior designer to use the rolling cart to bring in materials for their unit, even though all the other residents are allowed to use the rolling cart. Plaintiff also asked why they give the designer problems accessing the key, when there are notes in the system allowing her a key to Plaintiff's unit even if they are not present.

75. Ms. Davis indicated that she would address the issue, however, this behavior continued until the interior designer completed the project.

76. On or about January 6, 2021, Roland, the handyman, dropped off mail at Plaintiffs' unit door that was not addressed to Plaintiffs.

77. Ms. Davis continually insisted that Plaintiffs open mail that is not addressed to Plaintiffs and stated that the Fire Chief dropped it off by Plaintiffs' door. The mail is a note from the Cliffside Park Fire Inspector addressed to One Park.

78. The concierge staff does not open the front door for Plaintiffs, nor address them appropriately.

79. The concierge staff opens the front door for non-African American residents and addresses them appropriately.

80. Kelly Geng, DMG Investments former property manager, instructed One Park's concierge staff not to speak to certain tenants including Ms. Jones who she described as "rude, fresh, and a mean tenant."

81. On March 13, 2020, Mr. Adams complained to Evan Pimental and an employee of DMG Investments that he was being racially discriminated against. Mr. Pimental had instructed concierge staff that Mr. Adams was not to be addressed and that Mr. Adams was not allowed to collect the names of other residential unit owners. Mr. Adams was actually not attempting to collect this information but was falsely accused. Upon learning that the individual who was collecting this information was non-African American, this individual was allowed to continue to collect information.

82. From approximately November 2019 through February 2021, Concierge Nancy Deltorre, an employee of DMG Investments, would repeatedly send black visitors to Plaintiffs' unit assuming that they were at One Park to visit Plaintiffs.

83. On many occasions, Plaintiff Adams advised Ms. Deltorre that just because a guest is black it does not mean that they are a visitor of Plaintiffs.

8

84. In the Spring of 2021, Abigail Brennan, an agent of DMG Park, approached Mr. Adams in the lobby of One Park and aggressively asked "are you 512". Ms. Brennan then went on to state that she had heard about "512". Ms. Brennan followed Mr. Adams and another individual and threatened to assault Mr. Adams. Ms. Brennan would later file a false police report with Cliffside Park Police at the instruction of DMG Park agents. On several occasions, Mr. Adams requested an Alternative Dispute Resolution ("ADR") to address the incident with Dianna Sylva, an employee of DMG Investments. One Park refused to provide an ADR to Mr. Adams. Dianna Sylva admitted to Mr. Adams and Ms. Jones that her hands were tied due to "higher ups" within DMG Investments, DMG Property Management, and One Park.

85. After complaints to management, Ms. Brennan continued to harass Mr. Adams and Ms. Jones including showing up to their unit on multiple occasions without invitation. Ms. Brennan was documented on security video at Mr. Adams and Ms. Jones' unit.

86. On or about August 14, 2021, DMG Investments employee, Kelly Geng, falsely alleged that she witnessed Ms. Jones harassing the front desk concierge; that Ms. Jones and Mr. Adams had threatened a cameraman that was working for Ms. Geng, and that Ms. Geng had called the police on Mr. Adams because she felt unsafe in his presence. Ms. Geng was instructed by Fred Lavinthal, who is an attorney for DMG Park, to document this false complaint.

87. All of Ms. Geng's allegations were false.

88. On August 14, 2021, Mr. Adams was told by an employee of DMG Investments, named Marco, that DMG Investments employees, DMG Park employees, and Maverick Concierge had a meeting where they were instructed to place towing notices only on Mr. Adams' vehicles parked in the surface parking area and to target him.

89. Mr. Adams complained to DMG Investments employee Dianna Sylva that this behavior was discriminatory and that he was being targeted due to his race. In response to Mr. Adams' complaint, Dianna Sylva sent an email to staff from DMG Investments, DMG Property Management, and Maverick Concierge instructing them not to disclose what was discussed in staff meetings with Mr. Adams. In order to further conceal the act of discrimination, Ms. Sylva instructed DMG Property Management employee Corey Pereira to place towing notices on other vehicles.

90. On August 13, 2021, Mr. Adams was informed by DMG Investments and DMG property management employees that they were instructed by management of both companies to monitor his home and the home of another African American residing on the 8th floor of the building.

91. On August 16, 2021, Mr. Adams and Ms. Jones were invited into Dianna Sylva's office in the early afternoon. At this time, Ms. Sylva shared emails that were being written in order to encourage DMG investment employees, DMG Property Management Employees, and other third parties to write false information about Mr. Adams. Additionally, the emails

9

were requesting that Ms. Sylva pull camera footage from the building security systems in an attempt to create a false narrative.  Upon pulling the security footage, Ms. Sylva was able to ascertain that Kelly Geng was making false statements about Mr. Adams due to his race.  Ms. Sylva also voiced to Mr. Adams that the leadership from DMG Investments, DMG Property Management, One Park, and DMG Park were encouraging Ms. Sylva and other staff to write false statements to the Cliffside Park Police Department and to use the Police Department to target Mr. Adams and Ms. Jones due to their race. Ms. Sylva stated that she felt uncomfortable with the behavior of leadership from these organizations as Ms. Sylva was also a licensed attorney and real estate broker.

92. On August 16, 2021, Dianna Sylva employee of DMG Investments also showed Mr. Adams and Ms. Jones a series of emails from executives from DMG Investments, DMG Property Management, One Park, and DMG Park who were instructing Ms. Sylva to perform discriminatory acts against Mr. Adams and Ms. Jones based on their race.  The individuals who were included on the chain of emails from August 14-16 included but were not limited to Jeffrey Amengual, COO of DMG Investments, Jacky He, CEO of DMG Investments and DMG Park,  Kelly Geng of DMG Investments, Fred Leventhal, agent of DMG Park, Chris Paldino, agent of DMG Investments, Samuel Neubold, agent of DMG Property Management, Gemma Giantomassi, agent of DMG Park, Christian O'Lone, VP of Asset Management of DMG Investments.

93. DMG Investments frequently divulged private information about Mr. Adams and Ms. Jones and colluded with executives from DMG Park, One Park Condominium Association, DMG Property Management, and Maverick Concierge in an effort to target them based on their race.

94. In an email Taryn Byron, an agent of DMG Park, who often targeted Mr. Adams and Ms. Jones requested private personal data regarding Mr. Adams and Ms. Jones' vehicles.

95. After being provided with their vehicle information Taryn and a DMG Investments employee commenced a plan to tow Ms. Jones and Mr. Adams' vehicles illegally while knowing that Mr. Adams and Ms. Jones were not violating any rules or laws as acknowledged in their emails.  Several other African Americans were also targeted to be towed while no Non-African Americans faced the same threat.

96. On several occasions in the Fall of 2021, Ms. Sylva approached Mr. Adams and Ms. Jones to warn them to contact their lawyers as she was being pressured to perform discriminatory acts by agents of DMG Investments, DMG Park, DMG Property Management, and One Park.  These acts included limiting the availability of common areas for use by Mr. Adams and Ms. Jones due to their race and also denying services to Mr. Adams and Ms. Jones due to their race.  Ms. Sylva also conveyed that she was being asked to write false statements about Mr. Adams and Ms. Jones. Ms. Sylva stated that another African American who lived in the building was also facing similar discrimination and retaliation due to their race.

97. After the departure of Ms. Sylva, subsequent employees of executives of DMG Investments such as Jackeline Novoa, Michel Encalada, and others have continued to deny Mr. Adams and Ms. Jones services at One Park.

98. In the Spring of 2023, Mr. Adams observed DMG Investments employee Michel Encalada and another employee refer to an African-American tenant with a racial slur while speaking in Spanish.

99. Michael Encalada has continued the harassment of Mr. Adams and Ms. Jones by making false calls to the local police department based on their race, attempting to deny Mr. Adams and Ms. Jones access to building services, and behaving in a hostile and racially insensitive manner at all times.

100. One Park Condominium Association board members have also continued to behave in discriminatory actions towards Mr. Adams and Ms. Jones.  In the Summer of 2023, Ms. Jones approached Boris Ostrovsky and asked why she had been excluded from receiving information that was distributed to non-African American residents.  Mr. Ostrovsky lied and claimed no knowledge of what was taking place.

101. One Park member Jill Falgiano bragged to Ms. Jones that Ms. Falgiano had received services that had been denied to Ms. Jones due to her race.  Ms. Falgiano also told Ms. Jones that the building and the city were targeting Ms. Jones and Mr. Adams due to their race.  Ms. Falgiano stated that she had these discussions in a meeting with Jacky He, CEO of DMG Investments and DMG Park, and Mayor Tommy Calabrese of Cliffside Park.

102. Residents of One Park are also encouraged to display hostile and harassing behavior towards Mr. Adams and Ms. Jones due to their race.  In the summer of 2023, a unit owner confronted Ms. Jones and stated that Ms. Jones and Mr. Adams were the cause of an HOA increase at the building according to Michael Encalada and Jill Falgiano. This resident proceeded to yell at Ms. Jones, call Ms. Jones a "nigger" and state that everyone wants Ms. Jones "black ass" out of the building.

103. Ms. Jones requested an ADR with the One Park Association to address this harassing behavior, and to date, an ADR has not been provided.

104. One Park has suites where tenants and owners' guests can stay while visiting One Park. Plaintiffs Adams and Jones and another African American resident are required to pay for the suites, while similarly situated tenants and owners, who are not African American, are not required to pay for the use of the suites.

105. Defendant Maverick Concierge provides valet services in addition to concierge services at One Park.

106. Maverick Concierge Valets repeatedly refused to offer services to African-American residents due to their race.

107. Ms. Jones frequently complained to DMG Property Management and Maverick Concierge owner Matt, that their employees were targeting her due to her race and also made her feel unsafe.

108. On multiple occasions, Maverick Concierge staff members refused to provide service that was offered to non-African American residents.

**Issues With Parking and The Parking Garage**

109. One Park has an automated parking garage on the premises which One Park marketed as state of the art.

110. The automated parking system is supposed to permit owners to drive their cars onto an entry bay, after which the automated system would pick up the car and transport it to the owners' designated spots.

111. On or about May 1, 2020, the Concierge told Plaintiff Jones that she was not on the list to receive a parking decal. She advised Ms. Jones that she needed to email the Leasing staff of DMG Investments to resolve the issue of the parking decal, although the Concierge claimed that she had no email for DMG Investments.

112. On or about June 3, 2020, after receiving several emails to pick up a parking decal for the guest parking lot, Plaintiff Adams walked to the front desk to ask for a parking decal from Jeannette.

113. Jeannette pretended not to have the decals even though Mr. Adams could see them on a clipboard in front of her. Jeanette walked to the back, pretending to be looking around for the decals.

114. Plaintiff picked up the clipboard and told Jeanette that these were the decals the email was referring to and that he was taking two for his vehicles.

115. The superintendent stated that Plaintiff Adams couldn't have the decals because he was told not to give any to Plaintiff. Non-African American residents had no problems obtaining parking decals.

116. DMG Park operates the parking garage in conjunction with One Park Condominium Association.

117. Plaintiffs' vehicles have been damaged by the operation of the automated garage as follows:

   a. On or around Sunday, July 26, 2020, Ms. Jones and Mr. Adams' Porsche Panamera 4 was damaged during the automatic parking retrieval process.

   b. The car suffered over an estimated $2500 in damage.

12

   c. Neither DMG Park, One Park Condominium Association, nor Unitronics would provide insurance information for this accident.

   d. On or about August 31, 2020, Plaintiffs' BMW X6 was damaged by a technician who was manually operating the garage to move Plaintiffs' car.

   e. Plaintiffs had not asked for their car to be retrieved and still do not know why the car was being manually moved.

   f. Plaintiffs' car suffered approximately 5K in damage.

   g. DMG Park and One Park Condominium Association refused to pay for the damages, nor provide insurance information to cover the damage.

118. Upon information and belief, One Park Condominium Association paid for Eric Chang's vehicle after the garage damaged his car.

119. Eric Chang is a similarly situated resident at One Park who is not African American.

120. On or about December 15, 2020, Plaintiff witnessed an unnamed security guard taking video of Plaintiff's license plate using his personal phone.

121. Christian O Lone of DMG Investments, stated that he did indeed authorize the guard to take down Plaintiffs' information on a personal phone, but they performed a daily audit and wiped his phone of our personal information daily.

122. After the damage to their vehicles, Plaintiff Adams and Jones began parking their vehicles at the outdoor surface areas at One Park like many other tenants and owners at One Park.

123. Upon information and belief, Plaintiff Jones and Adams vehicles were the only vehicles that received a note on them from DMG Management advising that they could not park at the outside surface areas.

124. In or about September 1, 2021, DMG Management threatened Adams and Jones with daily fines of $100 for parking in the surface parking areas.

125. Plaintiff Jones and Adams were then told that they should not communicate with DMG Management directly but through DMG's attorneys. Additionally, they were advised that prior to visiting the management office, Plaintiffs had to make their request to do so through their attorneys on 48-hour notice.

126. Plaintiffs are not aware of any other tenants or owners that are required to communicate with DMG Management through attorneys, nor are required to provide 48-hour notice to visit the DMG Management office.

**The Condominium Election**

127. On March 2021, DMG Park held an election for the condominium board during the association's annual meeting.

128. Ms. Jones was a candidate for election to the board.

129. Ms. Jones was subject to discriminatory treatment as it relates to the condominium board election as well.

130. Specifically,

   a. All candidates in elections are allowed to provide a candidate information sheet that can be submitted to association members who are eligible to vote.  Upon information and belief Ms. Jones was the only candidate who was not afforded the opportunity to provide a candidate information sheet that wished to do so;
   b. All candidates are entitled to a complete list of eligible voters in the association. Plaintiff made several requests for the list of eligible voters, however, she was not provided with this information prior to the election;
   c. She was prohibited from independently sending information to association voters;
   d. She did not receive a ballot to vote in the election even though she was an eligible voter; and
   e. Ms. Jones complained about not receiving a ballot and noted to property management that non-African American candidates including those who were currently in litigation received ballots.  Ms. Jones complained to DMG Management employee Christian O'Lone.  Ms. Jones was also denied a list of HOA board members contact information. Ms. Jones stated that she was being discriminated against based on her race.
   f. Non-African American candidates were allowed to have conversations with the insurance broker for the association to gain information on liability coverage. Ms. Jones was not provided with this information prior to the election.

131. In May 2023 DMG Park and One Park Condominium Board held another election.  Ms. Jones did not receive election materials.  Ms. Jones had previously requested an ADR to contest a balance the association alleged she owed.  The association currently owes Ms. Jones significant funds due to property damage which the association is responsible for. Other ineligible voters received voting materials and were allowed to vote. Ms. Jones complained to DMG Park and the Association that this behavior was in retaliation for filing the discrimination action.

**The Pending Action Against Defendants in State Court**

132. Due to Defendants mismanagement of One Park, fourteen residents, including Plaintiffs Adams and Jones sued Defendants and others in an action in the Superior Court of New Jersey, Law Division, Bergen County, docket no.:  BER-L-6608-20.

133. Notwithstanding that fourteen residents sued Defendants, the only two residents whom Defendants filed a counterclaim against were Plaintiff Adams and Jones, which serves as another example of their discrimination and retaliation against Plaintiffs Adams and Jones.

**FIRST COUNT**
**VIOLATION OF FAIR HOUSING ACT – HOUSING DISCRIMINATION**

134. Plaintiffs repeats and realleges the averments of paragraphs 1 through 133 as if fully set forth herein.

135. Plaintiff has established a *prima facie* case of housing discrimination.

136. The effect of the Defendants' discriminatory practices complained of has been to deprive Plaintiffs of housing free of discrimination in the terms, conditions, privileges, and services that they are entitled to as owners of a unit at One Park.

137. The unlawful housing discriminatory practices were intentional, done with malice and with reckless indifference to the federally protected rights of Plaintiffs based upon their race in violation of the Fair Housing Act.

138. By reason of the foregoing, Plaintiffs have suffered and will continue to suffer irreparable harm and injury.

**SECOND COUNT**
**VIOLATION OF THE NEW JERSEY LAW AGAINST DISCRIMINATION – HOUSING DISCRIMINATION**

139. Plaintiffs repeats and realleges the averments of paragraphs 1 through 138 as if fully set forth herein.

140. Plaintiff has established a *prima facie* case of housing discrimination.

141. The effect of the Defendants' discriminatory practices complained of has been to deprive Plaintiffs of housing free of discrimination in the terms, conditions, privileges, and services that they are entitled to as owners of a unit at One Park.

142. The unlawful housing discriminatory practices were intentional, done with malice and with reckless indifference to the protected rights of Plaintiffs based upon their race in violation of the New Jersey Law Against Discrimination.

143. By reason of the foregoing, Plaintiffs have suffered and will continue to suffer irreparable harm and injury.

## THIRD COUNT
## RETALIATION

144. Plaintiffs repeats and realleges the averments of paragraphs 1 through 143 as if fully set forth herein.

145. Plaintiff has engaged in protected activity when they complained about discrimination in housing.

146. As a result of their complaints of discrimination, Defendants have retaliated against the Plaintiffs by discriminating against Plaintiffs in the terms, conditions, and privileges associated with the purchase of a unit at One Park and denied the Plaintiffs services and facilities they are entitled to as owners of a unit at One Park.

147. The unlawful housing discriminatory practices were intentional, done with malice, and with reckless indifference to the protected rights of Plaintiffs in violation of the Fair Housing Act and the New Jersey Law Against Discrimination.

148. By reason of the foregoing, Plaintiffs have suffered and will continue to suffer irreparable harm and injury.

## FOURTH COUNT
## BREACH OF CONTRACT

149. Plaintiffs repeats and realleges the averments of paragraphs 1 through 148 as if fully set forth herein.

150. Defendants offered the automated parking garage to the Plaintiffs.

151. Plaintiffs accepted the Defendants' offer by parking their vehicles in the automated parking garage.

152. The Defendants agreed to safeguard and return Plaintiffs' vehicles undamaged from the parking garage.

153. Since Plaintiffs vehicles were returned damaged, Defendants breached the agreement with the Plaintiffs.

154. As a result of the breach of the agreement, Plaintiffs have suffered damages.

## FIFTH COUNT
## NEGLIGENCE

155. Plaintiffs repeats and realleges the averments of paragraphs 1 through 154 as if fully set forth herein.

156. The Defendants knew or should have known that the automated parking garage was defective.

157. As a result of the Defendants negligence in the ownership, operation, and maintenance of the automated parking garage Plaintiffs have suffered damages.

**WHEREFORE**, the Plaintiffs pray that this Court enter judgment on behalf of Plaintiffs against Defendants:

a. Declaring that the Defendants have violated the FAIR HOUSING ACT, NJLAD, and the Common Law;

b. For compensatory and consequential damages;

c. For punitive damages;

d. For Attorney's fees; and

e. For such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury of all issues triable by a jury.

Dated:    September 7, 2023
          South Orange, New Jersey

Yours etc.,
PRESTON & WILKINS, LLC

By:  Gregory R. Preston, Esq. (GP6138)
76 South Orange Avenue, Ste. 210
South Orange, New Jersey 07079
Tel:  212-809-5808
Fax:  212-898-9034
Attorneys for Plaintiffs

17